Tijlghman, C. J.
This is an action on a bill of exchange for 1050 dollars 50 cents, dated 1st December, 1815, drawn by Austin Es? Fenn, of Philadelphia, on Ralph Fenn, of Newbern, North Carolina, payable to’ Humphreys Green, or order, twenty days after sight. The bill was accepted by the drawee the 9th January, 1816, and came to the hands of the plaintiffs indorsed by Humphreys Green, James Phelps, and the defendants. It was placed in the hands of Mr. M'-K.inley, the plaintiffs, agent at Newbern, by whom it was presented to the drawee for payment, and payment being refused, it was protested on the 1st February, 1816, and notice given to the defendants in Philadelphia the 1st March following. A question arose on the trial, whether the defendants had received reasonable notice of the dishonour of the bill, but as I presume the jury were of opinion that the defendants had made a promise of payment after receiving notice, I must now take if for granted that the defect in the notice (supposing there was a defect) was waved by the defendants. But the defendants rely on another circumstance, which they say was concealed from them when they made the promise to pay, and that is, that the bill had been paid and the acceptance can- *367 celled, and afterwards set up again without their knowledge or consent, by agreement of the acceptor and M'Kinley, agent of the plaintiffs. If that is made out, it is very clear that the promise of the defendants, made under ignorance of so material a circumstance, which ought not to have been concealed from them, cannot be binding. The evidence on this point is derived altogether from the deposition of Ralph Fenn, the acceptor, and this is the more to be regretted, as it is very probable that if other persons had been examined, the facts, which aré now somewhat doubtful, might have been rendered so plain as to prevent all difficulty in matter of law. Taking it, however, on the deposition of Ralph Fenn, it appears that M'Kinley had in his possession not only the bill now in dispute, but another bill for nearly the same sum, also accepted by the said Fenn. Fenn sent his clerk to take up the other bill, but he took up the one on which this suit is brought, and returned with it to Fenn, who struck out his name as acceptor. In about five minutes from the time he received it, Fenn, having again written his name as acceptor, sent this bill back to M'Kinley, who received it and gave up the other bilk This is the evidence, and, in the first place, we are left in ignorance, whether the acceptor struck out his name by mistake, or knew what he was doing, and in a few minutes changed his mind. On this point he ought not to have left us in doubt, because the truth must be well known to himself, and to himself only. If, when he struck out his name, he was under no mistake as to the bill from which he struck it, the indorsers were immediately discharged, and never could be re-charged without their own consent. It was incumbent on the plaintiffs to make out the mistake very clearly, and I must say that I am not at all satisfied with the evidence. But if this could be got over, a question more difficult remains. It is probable that Fenn’s clerk made a mistake as to the bill which he took up; but very improbable that there was any mistake in M'Kinley. There was no evidence of the two bills being for exactly the same sum. The bill in suit was for 1010 dollars 50 cents, the other bill, Ralph Fenn says, was, he believes, fbr about 1000 dollars. Now it must be supposed that when the clerk paid the money, M'Kinley delivered him the bill which was paid for. So that, upon 'the evidence, the case appears to be, that the clerk paid for and took up the -wrong bill, but M'Kinley gave up that which, so far as concerned him, was the right bill; that is, the bill which was paid for. *368 If, indeed, the other bill had been paid for, and McKinley, intending to give that bill up, had, by mistake, handed to the clerk the bill now in suit, and the acceptor, under the same mistake as to the identity of the bill, had struck out his name, there would have been such a mistake all around as ought to have been rectified. In such case, the prior indorsers of the bill in suit would never have been discharged, because the bill would never have been paid ; and as for the striking out of the acceptor’s name, the prior indorsers could not avail themselves of it under such circumstances. In Fernandez v. Glynn, 1 Camp. 426, the clerk of a banker on whom a check was drawn, cancelled it, supposing that it was to be paid. But being afterwards informed by the banker that it was not to be paid, and being allowed, by the usual course of -business, to return the check by five o’clock the same afternoon in case payment was not made, it was held that the check might be returned before five o’clock, notwithstanding it had been cancelled. But the case before us is very different. McKinley held two bill's, both of which Fenn had accepted, and was bound to pay. His agent makes a mistake, for which he would be personally responsible. But McKinley makes no mistake—he receives payment of a debt justly due ; could he be compelled to refund the money ? If he could not, the payment extinguished the bill, and, although the agent might revive it, so far as his principal was concerned, yet he could not restore its validity, against an indorser who was not his principal. No case has been shewn where an action for money had and received, has been supported against a person who has received a just debt without fraud. Suppose a man indebted to two different shop-keepers, sends a servant with money to pay one of them, but by mistake he pays the other. It would seem plain that such money could not be recovered back, either by the debtor or by the shop-keeper for whom it was intended. And where is the difference between that case and the one before us ? The two bills in McKinley’s hands were as distinct debts as if they had been owing to two different persons. Indeed, I presume those bills did, in truth, belong-to two different persons for whom McKinley was agent, as nothing to the contrary appears. The case of Dey v. Murray, 9 Johns. 171, shews that an agent may pay his principal’s money contrary to his orders, and yet the payment stand good. There A. of New York, remitted 5001. sterling to B. his agent in London, with orders to pay a bill for the *369 same sum, which he had drawn in favour of C. A. after-wards drew on B. other bills, besides that for 500/., and B. paid them, because they were presented before the bill for * „ , , 500/. It was held that the payment was good, although the agent might be personally responsible for breach of orders. So in Rogers v. Kelly, 2 Camp. 123. 'A. placed money in the hands of B. his banker, tojbe paid to C.; but B. misapplied the money, and paid a debt of his own. It was held that the money could not be followed, though the banker was responsible for the misapplication of the funds entrusted to him. These cases do not come quite up to the point before us ; but they shew the protection which the law affords to one who has received money fairly and for a valuable consideration. The cases where money paid may be recovered again in an action of indebitatus assumpsit, are, where there has been a mistake in the payer, and it would be against conscience in the receiver to retain it. It may be recovered, says Lord Mansfield, (in Bize v. Dickason, &c. 1 D. & E. 285) “where it has been paid by mistake, and there was no ground to claim it in conscience.” So it may be recovered according to Tubby, C. J, in Tomkins v. Barnet, (Skin. 211. Salk. 22.) where one pays money under a mistake in an account, or under a deception. Supposing, then, that the bill which was paid by Fenn’s clerk, was due at the time of payment, the plaintiffs’ counsel has shewn no authority for compelling Kin ley to refund the money.. If so, no agreement or consent of his could charge the indorsers, who had once been discharged. This, I think, can hardly be disputed. In Paton v. Winter, (1 Taunt. 419.) the drawee altered the time of payment, and then accepted the bill, in which the holder acquiesced; held that the drawer and prior indorsers were discharged. In Master, et al. v. Miller, 4 D. & E. 320, the holder of the bill, after it had been accepted, altered the date, so as to accelerate the time of payment, and thus indorsed it for a full consideration ; by this alteration the acceptor was discharged. The principle is, that prior indorsers cannot be affected by acts done by a sub1» sequent indorsee without their consent. The immense property which is now circulated in the form of promissory notes and bills of exchange, makes it important that these instruments should be preserved unaltered in the course of their negotiation, and that the law concerning them should be strictly enforced. It may seem hard in an individual case, that a *370 mistake should not be corrected. But individual hardship is a much less evil than the introduction of a principle which might discourage people from indorsing bills of exchange. I am dissatisgecj with the verdict in this case, both as to the law and the fact, and I understand it to have been dissatisfactory to the Judge who tried the cause. On a second trial other witnesses may be examined, who may perhaps make the facts so plain as to render the law equally plain. The parties may frame their interrogatories so as to explain some very material circumstances which are at present involved in great obscurity. I am, therefore, of opinion that a new trial should be granted.
Gibson, J.
I admit, that if the transactions between the holder and the acceptor had, at any moment, been equivalent in point of law to actual payment of the bill, the indorsers would have been discharged, and that their responsibility could never, in such case, be restored by any subsequent arrangement between the holder and the'acceptor, whose acts would bind none but themselves. The holder must, at his peril, pursue every fair advantage he may happen to obtain in favour of the indorsers ; and so far, but no further, their interest ought to have a controlling influence on his conduct. If, therefore, he foregoes no right of which he may avail himself for the common good of himself and his indorsers, he does no act to affect them that he may not rightly do ; for nothing is payment between the indorser and the holder Which is not so between the acceptor and the holder, except neglect of the latter to act in the best manner for the benefit of all concerned. But the indorsers cannot urge against him the release of any advantage which he could not have enforced against the acceptor. The point, then, is, would the appropriation of the clerk, if ratified through mistake by the acceptor, be binding in favour of the holder, independently of all consideration of the indorsers’ interest ? for if it would, the indorsers would have such a concurrent interest in the advantage thus gained as would preclude the holder from waving it, without, at the same time, waving all further responsibility on their parts. to himself. It would be arguing in a circle to say, the appropriation was binding on the acceptor, and irrevocable, because the indorsers had an interest which could not be affected, and that being binding on the acceptor, it was available in favour of *371 the holder, and therefore must be considered so for all purposes beneficial to the indorsers. There is no analogy between the act of cancelling the acceptance, and that of putting a negotiable instrument into circulation, which may put the holder for a e-ood consideration into a better situation than . , ° _ . the drawee or payee ; for that would, m this instance, require the order of liability to be inverted; and beside, as the indorsers passed no consideration, nor incurred any new responsibility on the credit, or in consequence of the act of cancellation, they can receive no injury from the' transaction being unravelled between the original parties. There is nothing in the principles of mercantile credit that enables the interest of the indorser to vary the legal consequences of transactions immediately between the holder and the acceptor. In fact, the holder is the attorney of the indorser, and clothed with all his rights, which he engages to exercise for the joint benefit of both. We approach the transaction, then, divested of any influence which the interest of the indorsers might have on it, and we are to view it as standing, between the present parties, precisely as it would have stood in a cóntroversy between the acceptor and holder, if the latter, instead of consenting that the payment should be applied to another bill, had insisted on having it appropriated to the extinguishment of this. The inquiry, then, will be, whether the holder had a right so to insist. The defendants rest the affirmative of the question on two grounds; actual payment by an agent of the acceptor, and cancellation of the acceptance with the assent of the holder, which is said to be payment in point of law. If neither of these be separately a sufficient defence, both will not be so taken collectively. The evidence is, that the bill, being come to maturity, was twice presented for payment, which was refused ; after which the acceptor sent his clerk to take up another bill, in the hands of the same holder, for about the same sum, and accepted on the same day, but payable at a shorter period. The clerk, however, took up the bill now in question—but whether through the instrumentality of the holder, although he was particularly anxious to receive payment of it, does not appear—and brought it to the acceptor, who, supposing it to be the right bill, struck his name from the acceptance ; but discovering his mistake, in less than five minutes, signed it anew and returned the bill to the holder. Now this was a question of appropriation, and *372 I cannot, therefore, discover what influence mistake in the application of the payment, or the absence of it, on the part of the holder, could have on the transaction, or how his motives could, in any respect, affect the rights of the acceptor ; for it cannot be denied that the latter had a right to direct the appropriation as he pleased, and that of this right he could not be deprived without his own assent. It is a right oftentimes of great value, and one which the law protects with as much care as any other that can be enjoyed. This being, then, a question of appropriation, and not whether the acceptor could recover the money hack, the case is altogether different from those cited, of payment of a just debt by mistake, in which the party paying has not been permitted to sustain an action for money received to his use. It is not pretended that the acceptor was entitled to have his'money again, for the delivery of it was a good payment of one or other of the two bills ; but that he, therefore, had no right' to direct its application is altogether fallacious, because he could, in that, control the holder and all the world. The question, therefore, is, was there, at any period of the transaction, a deliberate assent of the acceptor that the money paid should be applied to this bill ? This depends on his own acts and on the acts of his clerk., Then, first, as to the acts of the clei'k. It is unnecessary to say, that while he acted within the limits of his authority, his acts were the acts of his employer. But here he acted under a special and limited authority which he transcended, and his act, therefore, whether done by mistake or purposely in violation of his instructions, did not bind his principal. But it is said there was no privity as to this payment between the acceptor and the bolder; and the case is compared to Rogers v. Kelly, and Dey v. Murray, in which it was held, that if money be remitted to an agent to be paid by him to a particular person, or in discharge of a particular debt, and he pays it to a stranger with whom the owner of the money has no privity, it cannot be recovered back by the latter, who can only look to the agent. The law is certainly so ; for money cannot, like a chattel, be followed on the general right of property, except perhaps where it has been received mala fide ; but to sustain an action against the possessor, there must be sufficient privity for the law to imply an agreement. Here, however, the money was in fact not paid -to a stranger, but to the very person for whom it was in *373 tended, and he having received it from the clerk in the character of an agent, would be estopped from denying the privity between him and the principal. Here,.then, was sufficient privity; but if there were not, the argument would be the worse for it, because, if the holder is to be considered as a stranger, and the acceptor is to look only to his own clerk, the clerk will in turn have his remedy against the holder, who, having passed no consideration for the money, would be considered as having received it to the use- of the clerk, and not inpayment of a stranger1 s acceptance ; and this would make short work with the allegation of actual payment. But if the clerk should be considered as having acted under a general authority, his act would be no more binding than the act of his employer, who, therefore, might avail himself of his agent’s mistake equally as well as he could of his own ; and this brings the matter to the principal question, whether any acts of the acceptor done by mistake, which would otherwise sufficiently evince his assent to the misappropriation by his clerk, can be considered as binding. Why should they ? It is said that, in commercial transactions, the interests of third persons, not directly parties, are so involved, that acts, which would otherwise have no conseq’uences between the immediate parties, become binding on them. I know of no such rule. Acts imparting credit to negotiable paper, although conclusive in favour of subsequent holders, may always be inquired into between the immediate parties ; and if it were not so, still here was no act giving a credit by which the previous indorsers could receive injury, or incur an increase of responsibility. Are they, by the correction of the mistake,, put in a worse condition than they would have been in if none had been made ? And if they are not, on what ground can they object ? It is said that acceptance once completed is irrevocable, without regard to the motive that induced the act; and that, by analogy, the cancelling of an acceptance, which evinced an assent to appropriate a previous payment to the particular bill, must also be irrevocable without regard to mistake or misconception of any fact that constituted the motive at the time. But without urging that neither Bentinck v. Dorrien, 6 East. 199, nor any other cáse cited, proves that acceptance is irrevocable before delivery to the holder, it is enough to say those authorities are unlike the case before us; for here was not a mere change of intention from discovering *374 a mistake in extrinsic circumstances which constituted the inducement to the act, but a total misapprehension of the very matter in Jiand. I can easily conceive that a man who has completed the act of acceptance, with full knowledge of the nature and consequences of the act he is performing, shall not be permitted to cancel it, merely because he misapprehended the true state of some collateral fact, with which the jholder had nothing to do; but it is utterly inconceivable how a person misapprehending the very nature of the act he is performing, and, therefore, ignorant of what he is doing, shall be said to yield assent so as to bind him. If aman, intending to accept a particular bill, should ignorantly write an acceptance on the face of another bill, supposing it to be the one he intended, can it be thought that this would amount to acceptance, in point of law, of the bill thus written upon ? Levy v. The Bank of the United States, is in perfect harmony with this distinction. \The entry in Mr. Levy’s bank book, and in the scratcher and cash book of the bank, placing the check to his credit, was equivalent to actual payment; and this the officers of the bank well knew. It was, therefore, the business of the bank to judge at its peril of the collateral matter of the genuineness of the check. But if Mr. Levy had presented two checks, and the clerk had, by mistake, passed the forged, instead of the genuine check.to.his credit, will it be pretended the bank would not have been at liberty to set the matter right ? So, the accidental cancellation of one paper instead of another will affect no right, as has often been decided in cases of wills, and the same principle is applicable to all other cases. But in commercial transactions the mistake should be rectified before any one is prejudiced by delay, in his relations with the other parties; for where a loss must necessarily fall on one of two innocent persons, it shall be borne by him whose act was the immediate cause of it. It cannot be pretended that less than actual payment of the bill would discharge the acceptor; and, therefore, if without authority from the holder he should strike his name out of the acceptance, it would be the act of a mere spoiler, that could affect nobody, and all previous responsibility would remain as if the obliteration were accidental. In this case, the acceptor had no authority to withdraw his name but on condition that he would agree to apply the previous payment to this bill, and having erased his name without yielding the requisite assent, *375 the act was merely void, and his liability under the acceptanee remained as it originally stood’. The notion held in Masters v. Miller, 4 Term. Rep. 320, by a majority of the Court, that a blot or obliteration on a bill of exchange which, prima facie, varies the rights of the parties, cannot be shewn to have not been fraudulent m fact, ought never to be received as law in this country. . The opinion of justice Buller, who dissented, is unanswered and unanswerable. Roper v. Birkbeck, 15 East. 16, was the precise case of cancellation of the acceptance by mistake, and yet the prior indorsers were not discharged. The cancellation, it is true, was the act of a third person, but what difference can that make, where there has, in reality, been accident and no fraud ? The holder, therefore, could not in this case, have insisted on the acceptor’s assent to the previous appropriation on the ground that the cancellation was an irrevocable discharge of his acceptance and liability, and that he, the holder, would be a loser, and without remedy, unless he were permitted to apply the money in his hands to the payment of this bill. My position is, that the mere cancellation, without actual payment, was not, per se, a discharge of the acceptor’s liability, and that it was no further material than as it might serve to indicate his assent to the previous appropriation ; and that being but evidence of ■assent, it may be explained so as to shew there was, in truth, no assent at all. It furnishes no objection to say, that as the acceptor could not have been a witness in a suit on the bill originally intended to be paid, he probably would have been unable to prove the mistake that actually occurred, and could, therefore, have made no defence to a recovery on that bill, and that, as the holder ran no risk in holding the money applied to the extinguishment of the bill now in question, he ought not to have agreed to an arrangement inconsistent with the advantage he had obtained. But to pursue an advantage depending on such circumstances, would be dishonest, and the holder is not bound to be a rogue for the benefit of the indorsers. By agreeing to such an arrangement he took on himself the burthen of proving that it was exacted by equity and good conscience. Then, as to the quo animo, the jury have passed ; for they could not have hesitated to find for the defendants if they had thought there was no mistake ; and although the acceptor does not,in terms, depose that he thought *376 he was cancelling a different acceptance, I think that may be fairly inferred from all the circumstances, and I am unwilling to disturb the verdict on that ground, especially as there has jjeen no serjous attempt during the argument to convince us the jury erred in matter of fact, nor do I understand there J _ . , . . . , i was any question or the acceptor having not acted through mistake agitated at the trial.
But the defendants set up want of due notice of non-payment ; and it is certain the notice was out of time. On the other hand, it is alleged that every irregularity of that kind was waved, with a full knowledge of all necessary circumstances. If the transactions between the acceptor and holder had been material, and, therefore, essential to be known, I would hold that the defendants had not due knowledge of them at the time of the alleged waver. Actual knowledge cannot be pretended ; and constructive notice from the obliteration of the acceptor’s name, which, for other purposes, would perhaps be sufficient to put a party on inquiry, would not be an answer to an objection to a ratification, on the ground of ignorance. Where knowledge of all necessary facts 'is requisite to render the agreement of a party binding, constructive knowledge is insufficient to obviate the legal consequences of actual ignorance. But as the transactions between the holder and acceptor effected no change in the rights of any one, -which -were in fact exactly as the defendants supposed, it was not essential that they should be disclosed. If a party has full knowledge of all necessary circumstances, a little matter amounts to a waver of notice. Here, then, was an express promise to pay ; and no matter whether it were conditional or absolute, there being no objection on the ground of want of notice, it recognised the regularity of the plaintiffs’ demand, and waved every thing not objected to. As to the effect of the promise as an independent ground of action, although there is a count on it in the declaration, it is unnecessary to decide, as I am clearly of opinion the plaintiffs are entitled to recover on the indorsement. If, however, the acceptor had been discharged by the acts of the holder, the promise would have been nudum pactum, and that, therefore, rendered a particular examination of those acts, and of their legal consequences, absolutely necessary. I am of opinion, the plaintiffs should have judgment on the verdict.
*377 Duncan, J.
The notice of non-payment by the acceptor was not given in time ; here was a delay of many days beyond the usual time, when, by the mail, notice might have been given. As there is no difference of opinion on this part of the case, it is unnecessary to expatiate.
The rule as to notice should be certain. Where there is a post, the next practical post day ; where there is no post, it is sufficient to send it by the ordinary mode of conveyance, although it might not be the earliest. Very special circumstances would justify a departure from this rule ; casualties and circumstances form exceptions to the rule ; but of the waver of notice, there was sufficient evidence. The defendants had knowledge of the fact, and although they at first insisted on the want of notice in due time, yet they unconditionally promised to pay the balance, after deducting the tar. There is no impeachment of the verdict on this ground, but on the objection to the verdict on the ground of payment by the acceptor tó the holder, and effect of the cancellation of the acceptance and its restoration, the Court differ. On the trial before me, I was of opinion that the acts of the acceptor and holder had discharged the defendants. If that opinion was right, the verdict ought not to stand. It will be proper accurately to understand the relative situation of the indorsers, acceptor, and holder of the bill. The acceptor, by his acceptance, acknowledged funds of the drawer to be in his hands. The drawer and indorsers were contingent guarantees that the acceptor should pay, or in default of payment and due notice given, they would. The holder was not the agent either of the drawer or indorsers; his duty was to demand payment, and give notice of non-payment. That payment was de facto made, the bill delivered, and in the hands of the acceptor, is proved incontestibly, and that he cancelled the bill; and the pretence to avoid this, and throw the debt on the indorsers, is, that all this was by mistake ; that M’-Kinley held another bill of his, payable about the same time, and nearly for the same sum, and that he directed his clerk to pay this other bill, and the clerk, by mistake, paid this bill, and delivered it to the acceptor, who cancelled it; that in a few minutes after, he discovered the mistake, restored his name, by consent of M'-Kinley, who received back the bill, and gave up the other. If this were a mistake on all sides, it should have been clearly established by the evidence ; but Fenn, the *378 the acceptor, does not swear that in obliterating his name, he made any mistake. This very important mistake, if it really was one, should have been explicitly stated, and not left to * • * ^ conjecture or taken by implication ; and as this was the sole ground °f defence, and was not sufficiently made out in évidence, for that reason alone a new trial should be granted. But there are other and stronger reasons with me j and I did not so put the case to the jury, for I put it to them as if Fenn had sworn the cancellation was by mistake. There was no evidence that the clerk directed the application of the money to any particular bill, or that M'-Kinley mistook or disobeyed any direction. If such had been the fact, its bearing would have been most important; if it really was so, it was incumbent on the plaintiffs to have proved it, and it was in their power so to do; either by the clerk or by M'-Kinley. It then, as it appeared on the trial, was a case clear of all mistake or misapplication by the holder. If no direction was given by the clerk to him as to the application, and there is no evidence that there was, then the- holder had a clear right to make his election, and apply the money to either bill. He exercised this election, and having once exercised it, he was bound by it. Mayor of Alexandria v. Patten, 4 Cranch, 317. And while I admit that the holder and acceptor, as between themselves might change the application, I cannot acknowledge their right so to do, if, by that change, they prejudice the rights or interests of other parties to the bill. This money came bona fide into the hands of M'-Kinley, and he having bona fide applied it, as he had the right to do, to the payment of this bill,, he might retain it; it never could be recalled or recovered back from him. Story’s Ckitty, 310. If M'-Kinley had refused to giveup the other bill, and take back this one, insisting on things standing as they were, Fenn had no remedy against him. Could it, then, depend on the will and pleasure of M'-Kinley, having once made his election, whether the indorsers and drawer, after they had been unbound, should - again become bound, nolens volens? If he could have done so, it follows that he could have restored back the money to Fenn, and then have looked to these defendants for payment. This would be against every principle of equity with regard to sureties and principal, for if the principal has left a sufficient sum in the hands of the obligee which he might retain, and he thinks fit, instead of retaining it, to pay it back to the prin *379 dipal, the surety never can be called on. Law v. East India Insurance Company, 4 Ves.jr. 824. And the Chancellor there dedared it made no difference whether the money was paid back _ . . * . . by the Company or ignorantly by their officers. My opinion is not founded on the cancellation alone; it has a deeper foundation ; the payment, which being rightfully applied by the .creditor, never could be revoked to the prejudice of the indorsers, who were only contingent guarantees. The acceptor was discharged by the holder, and he never could afterwards have recourse to any other parties on the bill. 16 Johns. 45. Lynch v. Robinson. The principle, in short, is, that an act beneficial to the other parties may be done with the accceptor of a bill without impairing the right of the holder, but no act can place between them prejudicial to the rights of the other parties without discharging them. By this payment, the contract of the parties to the bill ceased,. so as to prevent their being subject to new engagements. Hence it is, that an indorsement cannot be made after payment, so as to bind any parties to the bill, except the parties making it. 1 W. Bl. 89. Bacon v. Searles. Incalculable mischief would ensue if, after a bill had been taken up by the acceptor, the indorser should be liable to be called on for payment, and that a payment and cancellation could be explained away by the ex parte act of the acceptor supported only by his own oath. The money was rightfully applied by the holder to this bill; the payment was made pleno jure ; but one further step was taken, the cancellation.
A principle invariable in equity, is, that where an act has been done by the obligee to the injury of the surety, or that may possibly injure him, such act is always gladly laid hold of in equity to discharge him. So it is a fixed rule of law, that the surety is discharged when, by the act oí the creditor, the guarantee cannot have the unimpaired benefit of a substitution to the rights and privileges of the creditor. These are equally rules of reason as of law, and apply' in their fullest extent to the case now in judgment. Nor do the Court try the cause by inquiring what mischief it might have done, for that would lead to a variety of speculation upon which no sound principle could be built. Rathbone v. Warren, 10 Johns.595. A difficulty is here thrown on the indorsers in the recovery over against the drawer and prior indorsers; they are exposed to the difficulty a-id expense of accounting by testimony for this obliteration; the witness may die, or be out of the *380 reach of the indorsers. A plain case of recovery is rendered very doubtful¿; there is a certain expense and great difficulty imposed on them, and a risk of their being defeated in the recovery by the acts of those who held the bill and had power over **•J and these wise and just principles have been applied to cases of this kind, where an acceptance had been cancelled by mistake, by one who had no authority to cancel. It was urged in argument on behalf of the indorsers, that before they are compellable to pay, they have a right to require that they shall be placed in a situation to have th.e usual means furnished themofresortingtopriorindorsersor drawers. The bill appears on the face of it to be paid, and it will be necessary, to support an action on it, to go into evidence explanatory of that circumstance. The evidence may be removed out of the party’s reach by death or a variety of accidents. It is clear the cancellation imposes on them many difficulties, and the parties who hold the bill at the time have no right, by their own act, to impose these difficulties on others, although, if the law had cast them on them, it might have been different. Lord Eelenborougii allows the solidity of this reasoning, and says, generally speaking, undoubtedly the indorsers are bound to restore the bill in the same plight to the other indorsers as they received it, and unchanged by any act of theirs. Had they the poweror authority to do the act, the argument, he acknowledged, would have pressed hard upon him, but he could not consider the act of- cancellation as affecting the bill, because done by one who had no authority, express or implied; it was the act of a third person, and then he may beat liberty to correct the mistake ; in furtherance of justice, it might be considered as a blot fallen on it, or a child torn it. Roper v. Birkbeck, 15 East. 16. The alteration or erasure of a deed annuls it; so taking off a seal by one of the obligees or parties having an interest in the bond, unless it is done by mere accident; and the principle applies to all written instruments as well as deeds, that any alteration by those who have power so to do, avoids the writing. Master v. Miller, 4 T.R. 330. Anstruther, 229, affirmed ir. the Exchequer Chamber unanimously. This cancellation was, in fact, the act of the holder of the bill, for he gave it up as satisfied. To it both he and the acceptor were parties, and have, as between themselves, the right to restore it, yet it could not be revived by any ex parte act as to others. The holder, by receiving payment, had no dominion over the *381 bill; as to him, it was discharged ; he could not alter the situation of any other party to it, to the prejudice of that person; if he did, he could not afterwards proceed against him; even if he had dominion over it he could not do so. Gould v. Robson, 8 East. 580.
This question is said to be one of great magnitude, and worthy to be considered in the most sober manner before it it is decided, whether, after an acceptance once clearly made, it could be explained away by an obliteration ex parte. Great inconvenience would ensue from letting in such a practice. Bentinck v. Dorrien, 6 East. 199. It cannot be overlooked here that the acceptor is the sole witness, uncorroborated either by the clerk or McKinley, and that no good reason is assigned for preferring one bill to the other. The money was paid by one bound to pay it, to one having a right to receive it.; it was received rightly, it was rightly applied; the bill had performed its office, and although, as between M-Kinley and Fenn, it might be set up by the new acceptance, this would only amount to a renovation of the debt, as between them; it could not restore the bill to its pristine and original form, and make it a new contract binding on those who were not parties to it; for if, on a bill being presented for payment, the drawee alters it as to time of payment, and accepts it as so altered, and the holder acquiesces in such alteration and acceptance, it is a good bill as between the holder and acceptor, but it vacates the bill as to. the drawer and indorsers. Patton v. Winter et al. 1 Taunt. 419. The. same principle will be found in 3 Maule & Selwyn, 95. The debt was extinguished ; if extinguished- for one moment, it was gone for ever, and the acceptor and holder had as much power to rebind the drawer and indorsers at the end of five years as at the end of five minutes. The holder ceased, by the payment and application of the money to this bill, to be the creditor of any one party to the bill; the guarantee of the indorsers was satisfied; they guaranteed payment, and payment was made. If he had let it stand, on what principle is it that the holder can have recourse to them? The renewal of the bill was his own voluntary act, a new contract, binding on the parties to it, and no others; the remedy was gone at law as to the defendants, and if not gone at law they would be protected in equity; any plank for a surety to cling to consistent with a good conscience. It is not the identical bill which Fenn accepted that he *382 refused to pay; that had been discharged, and it required the act of McKinley to restore it; and what bears down every impediment is, that had not M'-Kinleu come to this new aaree- , , , , . ment this defunct bill never could have again breathed ; for ^y the obliteration of the name of the acceptor, the names of the drawer and indorsers were obliterated ; and I own I cannot see how it is possible that Fenn, by renewing his acceptance can renew the obligation of his sureties. Admit that Fenn made a mistake in paying this debt; he did not intend to pay it, but he did pay it; he did not intend to cancel his obligation, but he did so ; is there any thing against good conscience in his sureties taking advantage of this? A man owes two bonds, each for the same sutn, payable to the same person, and on the same day, with different bondsmen; he sends his clerk to pay one, and he pays the other ; the bond is put into his hands, he takes off his own name and his own seal, by mistake, if you please ; can he, by again sealing and delivering the bond to the obligee, set up this as the bond of his sureties ? If he can do this, then it is true that the holder has restored this extinct bill to its original state, and to its full operation against all the original parties, and then it is not true, that if a surety is once absolved, he continues so, unless he renews his obligation. It does appear to me to be nothing else than a reception of the bill after the day of payment, when the new agreement was made, and the interchange of the bills took place ; in reality it was so ; it would not be the same bill with the indorsement of the defendants on it; it was hot any evidence on the plea of non assumpsit, for the substance of that plea is, that he did not promise to pay in the form stated in the declaration, and that according to that form, he is not bound to pay.
This course of reasoning had appeared satisfactory to my own mind; and nothing but the diffidence I ought to entertain, and do entertain of my own judgment, when I differ from those whose opinions I so much respect, could diminish my confidence in the justness of the conclusion I have drawn. But I must distrust this conclusion : of the principles which have led me to it, I cannot doubt; and I must confess, with all deference, I have not heard any reason to satisfy me that these principles do not apply to the facts in this case, or to change my first opinion.
The promise to pay by the defendants amounted to a waver *383 of the neglect of the plaintiffs in not giving nptice, and admits .their right to recover, notwithstanding these laches; but this is because this defence does not always meet the justice of the case. The Court does not decide on the ground of a new promise, but merely a waver of the laches; but even this must be with full knowledge of the facts, for if a drawer or indorser pay in ignorance of the facts,he may recover the money back. There was here no knowledge of the fact of payment and cancellation; the objection made was want of notice, and that only was waved. The waver of that does not preclude the defendants from any other defence. The visible alteration of the acceptance, it was contended, ought to have put the party on inquiry. If the defendants had been acquiring a right, this might have been sufficient to put them on inquiry, but they were acquiringno right. In ordertomake such a promise binding, it should be made with knowledge of all the facts, and with knowledge that he was discharged, and, knowing that, enteredintoa new agreement to pay. But for such a promise, if the payment could not be revoked, and my opinion has been already expressed that it was irrevocable, there was no consideration legal or equitable; for an express-promise only can revive a precedent good consideration, which might be enforced at law, through the medium of an implied promise, had it not been suspended by some positive rule of law, but never can give an original right of action, if the obligation on which it is founded could not be enforced at law, although not barred by a legal maxim or statutary provision. For all these reasons, I am of opinion, that the verdict is against the evidence and against law, and should be set aside, and a new trial granted.
New trial granted.